Good morning, everyone. Welcome. Our first case this morning is Uncommon, LLC v. Spigen, Inc. Mr. Campbell. May it please the Court. Good morning. Ben Campbell on behalf of Uncommon. This case presents several issues addressed in our briefs, but many of the underlying errors stem directly or indirectly from a single abuse of discretion, specifically the acceptance and consideration of the Martinson Declaration. If the Rule 26 disclosure requirements for experts are to have any weight, then the exclusion under Rule 37 meant to enforce those requirements must be given teeth. The Martinson Declaration was submitted with Spigen's reply in support of its summary judgment and formed the basis for many of the District Court's rulings on that motion. Mr. Campbell, I am concerned that Mr. Martinson was not designated as a testifying expert. But putting that aside, they did indicate that he may be called to testify as to the methodology of the survey, and they turned over his credentials, they turned over the survey, which had detailed information with respect to the methodology. What is it that you think you would have received from an expert report that you didn't already receive? Sure. We would have received an explanation regarding the requirements for a survey, the conclusions drawn from that survey, and the opinions that were held from that survey. For example, in the declaration – But didn't you get – he was not offering opinions himself as to the survey, and you received Mr. Bania's expert report, who was relying on the survey and giving the opinion. So you had that. What is it with respect to Mr. Martinson that you think you should have received in an expert report that you didn't? Sure. So there are certain discretionary things that are done in conducting these surveys. For example, in the declaration, he refers to this being a sprite survey as opposed to an ever-ready survey. And the reason given in the declaration is that he determined that these marks were relatively weak and that an ever-ready survey is more appropriate for more famous marks. That's an opinion that was never said to us at any point by Mr. Bania in the survey results that we were given. That was something that was never told to us until the declaration that was submitted in reply to the summary judgment briefs. So let's suppose that that last point you made is correct. Is there anything that prevented you from requesting a deposition at that point? I realize what the litigation schedule was, but couldn't you have said, look, we face some real prejudice here, and we need to depose this fellow? Sure. At that point, I don't think a deposition would have cured the prejudice. At that point, we'd already made the litigation strategies to not retain a rebuttal expert because, in our opinion, there was nothing to rebut. There was no admissible survey. There was no survey expert that was going to testify. So we did not retain an expert that could have looked at that same survey, drawn different conclusions from that survey, conducted his or her own rebuttal survey, or attacked the way that the survey was conducted. But did you ask for that? Did you ask the district court judge, say, hold on here, we just found out about this. Can we have leave to depose him and potential leave to conduct additional expert discovery? We did not ask for a deposition at that point. At that point, expert discovery had already been extended a couple of times because of issues with Mr. Bania, and we just didn't feel that it was appropriate to continue to keep kicking the can further down the road. Additionally, as I noted, I don't think a deposition would have cured the prejudice. We're supposed to get the report to outline the opinions being held, outline the manner in which the survey was conducted, and that's supposed to be given to us essentially for free. I mean, the whole point of an expert report is it gives you this information about what testimony could be given, and you don't have to go through the cost and the expense and the procedures of doing a deposition. It's not unheard of to not even depose experts because they're restricted to their opinions that are outlined in the report. And if the report is sufficient, you should know what they're going to say in testimony. You may not even need to depose them. Why didn't you seek to depose Martinson during expert discovery, given the disclosure that he would be available to provide the foundation for the survey, which anybody who does trademark law knows how important that survey is going to be. Sure. So the disclosures of experts and the expert reports didn't happen at the same time. Oftentimes those do happen at the same time. The disclosure was made in advance, and then the reports and additional information were provided later. So when we got the designation saying that Mr. Martinson was non-testifying, there's that kind of footnote in there that he may testify regarding the way the survey was conducted. It wasn't a footnote. It was in the disclosure itself. Sure. But that coupled then with the failure to produce a report at the deadline for expert reports gave us the impression that either they didn't think he was necessary to testify regarding the way that the survey was conducted or that he was not going to be testifying. It seemed to be kind of a, in the disclosure it seemed to be kind of a placeholder in case they later decide that he needs to issue a report and testify. Was this a strategic decision on your part that you didn't want to depose him and you were going to wait until summary judgment to strike the report for lack of foundation at that point? No. First of all, I'm not sure that if we'd have asked Spigen if we can depose him if they would have said yes. Discovery was not the least contentious thing in this case. And when you have a non-testifying expert, the default is that you can't depose them. When you have a testifying expert, you can't depose them until their expert report is given. You never know until you ask, though. Agreed, but we didn't think it was necessary. We looked at it and we took him at their word that he's not testifying, that this isn't going to be introduced. It's not unheard of to have a consumer survey done as part of an investigatory process. The client or the counsel may want to know how people view certain facts. Oh, but Mr. Bania's expert report certainly should have informed you that this was more than just investigatory. You knew when you received Mr. Bania's expert report that this survey was key to his opinions. And, again, if you practice in trademark law, you know how important those surveys are. Sure, but we took the opinion that Mr. Bania was not qualified to discuss things about the survey. He was not a survey expert, and it wasn't our job, in our opinion, to correct their errors, to fix the disclosure. Well, you always have to have a plan B, though, if you lose that strategic motion. Sure. Again, it wasn't we took them at their word. We understood that Mr. Martinson was not going to be testifying. And on that basis, that this survey was not going to be introduced as evidence. It may be part of what Mr. Bania was the universe of information that Mr. Bania considered. Experts are allowed to consider information that's not admissible as evidence. But they're not allowed to draw opinions based upon the opinions of another non-testifying expert. They can't serve as a mouthpiece for an expertise that they don't have. Well, they can certainly rely on other experts' reports. The rules make that clear. Sure. But they can't rely upon the discretion being employed by an expert who's not there to testify about their use of that discretion. This consumer survey is one of those types of examples where there's lots of discretionary choices that are being made by the survey conductor and the expert during the process that Mr. Bania is not qualified to discuss. He's not qualified to have opinions on. When you filed a Daubert challenge to Mr. Bania's expert testimony, why didn't you raise the methodology of the survey at that point since that was a chunk of what he was testifying to? Sure. First of all, we didn't have full disclosure on the methodology, so to speak. Well, you had the survey itself lays out the pages 3 to 5 lays out the survey methodology, including the questions. Correct, but not the requirements and how Mr. Martinson believed he met those requirements, not his decision to do what he calls a sprite survey as opposed to an ever-ready survey, not his analysis. But you knew all of that when you challenged Mr. Bania's testimony under Daubert. Why didn't you raise it at that point to put the court on notice and to put the defendants on notice that Mr. Bania can't rely on this survey because there's no foundation, there's no expert testimony admitting it? At that point, our view of the case was that these were aspects of his report, but he was really presented as a damages expert, so the bulk of his report is really directed towards a calculation of what he considered damages to be in this case. And so it didn't strike us at the time that this is really an end-around way of getting towards the validity or likelihood of confusion of the marking question. I'm a little surprised that you could read his expert report and claim you didn't know that the secondary meaning issue was up front in his opinions. It's in his opinion on, it forms the basis of some of his considerations regarding what he thinks damages should be, but he doesn't take the opinion that the mark should be invalidated or that there's not a likelihood of confusion. That's not what he was presented for. He was presented as a damages expert and did a calculation of damages and addresses some of these issues as part of the road to get to where he thinks damages were, he takes the opinion that damages were zero in this case, which obviously is something we also took issue with. So in light of that discussion or in light of the discussion we're having, what's the most specific point or points you can make about the prejudice you suffered here? Sure. We're presented with a non-testifying expert. We take them at their word at that. So we didn't retain a rebuttal expert who could have either conducted his or her own survey or more likely taken issues with the questions that were presented. As we put in, I believe it's in our reply brief, a lot of the questions in our view are very misleading. They make a distinction between a trademark that's a brand name versus a trademark that's not a brand name. But you know going into litigation, don't you, that if the mark is descriptive, you're going to have to deal with secondary meaning, and you also know it's just a matter of the elements. You're going to have to deal with confusion, marketplace confusion. And so you run a real risk, don't you, by waiting to see how the plaintiff rolls out its evidence before you do anything on those two fronts? So we have a registered mark, so we're entitled to that presumption until the defendant comes forward with something to rebut that presumption. And on the secondary meaning, that's actually an important point because the court analyzed all the evidence that the defendant brought forward, and except for the survey, he said that evidence does not rebut this presumption. There is a presumption of secondary meaning but for this survey, and then went into the survey. So it really wasn't until the inadmissible survey got presented that that presumption was rebutted. But when you got that survey, what was it, in December of 2016? Weren't you in a position to anticipate this is exactly how they're going to use this? I don't think so. I still think that it was appropriate to view it as an investigatory process that Mr. Bania was improperly relying upon. He also relied upon information that he gathered from the Internet, but we have no idea who did those surveys. Obviously, those aren't surveys that he could have properly relied upon. And so it seems like he was using this as kind of extra evidence to kind of rebut this position or to buttress this position that he was already going to take no matter what the evidence kind of presented. You certainly knew at that point that defendants were going to argue that the trademark was descriptive. You certainly knew that back in December of 2016 when the survey was turned over. We knew that was one of their defenses. And you know as part of that defense that secondary meaning is a prong of it that they were going to try to prove or lack thereof. Yeah, so again, we took a position that we're entitled to that presumption until they come forward with something. In our viewpoint, the stuff that they've come forward with did not rebut that presumption. They had other defenses that they litigated all through the entire case and then never argued at summary judgment. It just dropped away, for example, generically. But that doesn't mean you don't prepare for them in discovery. Sure, and our viewpoint is that we did properly prepare for them, that we did what we could under the case as it was presented to us at the time where we have a non-testifying expert doing this investigatory survey. It seems a bit surprising that experts in trademark law, knowing there's a secondary meaning question going to come up and a likelihood of confusion question that's ultimately going to come up, wouldn't look into doing a survey or challenging the other side's survey if that's the only survey being put forth. It's important to remember, though, that this case presented with two competitors using the same mark on the same goods in the same channels of trade, indeed the same websites, to the same nationwide audience. And I understand those are your arguments, but it couldn't have been surprising to you that they were going to argue that this trademark was descriptive, and so you would prepare for that as a potential defense. I don't think it was necessary, though, to do a survey in that situation, especially when there's a lot of case law that calls question into surveys. It's very difficult to do a survey in this type of a case. But those are often weight issues, not issues of throwing surveys out. Exactly. Which, again, would put the onus back on you. But when you've got these cases that instruct us that it's very difficult to do a survey that accurately reflects the market condition, that removes the information that would lead the respondent into giving the answer that you want, but also gives enough information for the response to actually be of use, it's very difficult to craft these surveys in that type of an environment. So knowing that case law, I'll come back to the question that Judge Scudder and I have both asked you, why didn't you attempt to challenge this survey before the response to the summary judgment motion? It had never been presented that it was going to be an evidentiary survey until Spiegan's motion for summary judgment. And you didn't take their disclosure of experts that Mr. Martinson may, however, be called on to testify on the methodology of the survey if needed? You didn't take that as him potentially testifying? Not when that is followed up with the failure to issue an expert report. With? The failure to issue an expert report. And that's important, again, too, because the Rule 37 standard that the district court applied includes the fourth factor, the willfulness of the party to withhold the information that's not disclosed under Rule 26. Spiegan in this appeal is now identifying Mr. Martinson as having been misidentified, saying that they intended to identify him as an expert witness who would testify, but didn't intend to issue a report. Isn't that what the district court said? No. The district court basically said they should have seen that he needed to testify and should have identified him as a testifying expert and should have issued a report, not that they intended to identify him as a testifying expert but intended not to issue a report. That seems like a very intentional act to not satisfy the Rule 26 requirements. Well, the district judge said it was just a mistaken judgment in classifying him as a non-testifying expert, not that there was something willful in the sense of deceptive about it. Correct, because the district court didn't have Spiegan's now characterization of Mr. Martinson having been misidentified. They've taken the position on this appeal that he was misidentified, meaning he should have been identified as a testifying expert, not that they made a strategical mistake,  that they misidentified him, that they intended to identify him as an expert who would testify. How is that inconsistent with what they told the district court? That seems consistent with his determination that they made a mistake. They made a mistake of judgment, not a mistake of identification, is what I drew from the district court's opinion. The fact remains, though, that they did in that disclosure say, hey, look, there's a possibility this guy could testify. And then when you got those slides in December of 2016, the second bullet point in the slides, right behind the cover page, says that the objective of the survey was to measure likelihood of confusion and secondary meaning. I'm just having a difficult time seeing when you got that. You have it in your hands thinking, hey, look, this guy's been misidentified or there's a possibility he's been misidentified, and this may be some kind of backdoor attempt to put an expert out here. We need to depose this guy, challenge the disclosure. If it's a strategical attempt to backdoor an expert in, I think that's still improper. Again, there's – Well, it may be. I'm willing to grant you that for discussion purposes. It may be. But the point is that you had it in your hands at a time in the litigation where you could have acted upon it. Right? You could have said, hey, look, Judge, there's a real problem here. This guy's been misidentified. We have to take his deposition. Is this a report? Is it not a report? What is this thing, these PowerPoint slides? In hindsight, that may have been something that we could have done at the time. With the way the case was presented, it didn't seem appropriate at the time. Unless there are any further questions, I'd like to reserve my last minute or so here for rebuttal. That's fine. Ms. Kim. May it please the Court, my name is Karen Kim. I'm here on behalf of Appellees Vegan, Inc. Regarding the Martinson survey, Uncommon hasn't presented any evidence or case law to support its contention that the district court abused its discretion in allowing the survey. It hasn't cited a single case that would support its contention that Vegan's error in not fully complying with Rule 26 was harmless. Why didn't you disclose Mr. Martinson as a testifying expert? You knew that survey was important to your defense. You knew you were going to use it to help establish lack of secondary meaning and lack of likelihood of confusion. It's clearly expert work. Why didn't you identify and disclose him as an expert? It was purely an error on our part. When did you realize that error? We did not realize it until Uncommon brought it up in their opposition to Vegan's summary judgment motion. At that time, we were like, oh my gosh, we have to do something. And so that's why we submitted the sworn declaration from Mr. Martinson to bolster his survey findings and the raw data that he had already given to Uncommon. Didn't you recognize the importance of that survey during Mr. Bania's testimony and during your preparation of him to testify as an expert relying on that survey? Unfortunately, we did not at that time realize that. We thought that Mr. Bania could rely on the survey for his opinions without bringing Mr. Martinson in as a testifying witness. Did you offer that plaintiffs could take the deposition of Mr. Martinson when you filed the declaration in reply to the summary judgment? We had already said in the expert designation at the very beginning of expert discovery that he could be deposed for methodology, and had Uncommon asked to depose him, we would have certainly allowed that to happen. But Uncommon never asked, and so we thought we had already made an offer. The district court went through several considerations to apply Rule 37 in allowing the Martinson survey. And the first of those was the prejudice or surprise to the party against whom the evidence is offered, and there was no prejudice or surprise here because Uncommon had knowledge of Mr. Martinson since December 2nd of 2016. When you submitted the declaration, it was in support of your reply or attached to your reply summary judgment brief, was it not? Yes. And I think you just indicated, but you can say otherwise, that you did that in response to a concern that had you not submitted the declaration, there may be an evidentiary gap on your part. So if that's right, how is that not prejudicial to Mr. Campbell's efforts? Because Mr. Campbell, I think, is making the point that, look, it's too late in the summary judgment briefing stage to come forward with a key evidentiary foundation to support an opinion embedded within an opinion. And we're able to prevail. We should be able to prevail against the backdrop of that evidentiary gap. Why isn't that prejudicial? Because Uncommon had all of the same information, except for the squirt survey procedure, but all the other information had already been presented to Uncommon in the survey findings. Mr. Martinson's methodology was outlined in almost exactly the same wording as in his declaration in the survey findings. Further, when they deposed Mr. Banya, they asked him whether he was a survey expert and whether he had knowledge of how this survey had been created and administered, but they didn't. And Mr. Banya testified that he had not. And that should have triggered or put them on notice that they should try to depose Mr. Martinson if they needed further information, but they didn't request any deposition for Mr. Martinson. There was certainly some information in the declaration of Mr. Martinson that was not previously disclosed, wasn't there? I believe it was just one paragraph regarding squirt and Ever-Ready. Why wouldn't the failure to disclose that format information, that squirt format information, previously be prejudicial to the plaintiffs? I believe that it's a format that is described often in cases. There are secondary sources on it, and it's not something that's unknown in trademark law or about surveys, so it would have been easy for them to understand what the squirt survey format is. Further, if they had requested a deposition or further information on that format, Spiegel would have been ready to give it to them. Was there ever a request, and I didn't see it on the DACA, but was there ever a request to file a SIR reply in response to your reply that was filed? No, there was no such request. And again, Uncommon had every opportunity to try to cure its prejudice, if there was any, by requesting to depose Mr. Martinson, but Uncommon just never did. And Uncommon says that, oh, they couldn't because he had been designated as non-testifying, but the district court noted that Martinson wasn't shielded from being deposed because his survey was relied upon by Mr. Bonias in his report, so that opened him up to deposition, even though he was a non-testifying expert. So they could have actually deposed him at any point. And again, there was no bad intent or willfulness on Spiegel's part for this because Spiegel just made a mistake. We mis-designated Mr. Martinson at the beginning, and we found out too late at the opposition, and we tried our best to rectify our mistake. But again, if Uncommon had requested further information, even at summary judgment reply, Spiegel would have been willing to give it to them. Who has the burden to try to cure any potential prejudice? Is it plaintiffs or you? If the potential prejudice came from your mistake, who should be trying to cure that? I believe it's the party that has the prejudice that has the burden to try to cure it because they recognize that they have that prejudice, if there is any. And I know that Mr. Campbell didn't go into descriptiveness, but if I may delve into that just a little bit. Can I ask you a question on that? Maybe you can just include this in the remarks that you make. Yes. How do we make sense out of, or do we even need to, the way the Patent and Trademark Office has handled terms like capsule, or the term capsule? Your adversary has registered mark in that. You were denied one, or your client was denied one, but granted another one. And so you have some being recognized, some not being recognized. Is that a relevant consideration for us at all? Well, Spiegel's marks have been registered. There are two that are still pending this litigation. They've been suspended pending this litigation. But three of Spiegel's marks have been registered, air capsule, capsule capella, and capsule solid. Two of those are on the principal register. And I believe one or two of them, or maybe one of them, did receive a likelihood of confusion refusal from the USPTO. However, we were able to overcome that refusal because capsule was required to be disclaimed. And once capsule was disclaimed, the other word became the dominant part of the mark, and there was no more confusion. Why the PTO has gone from allowing capsule to be registered on its own to now requiring that capsule be disclaimed for similar goods? I mean, they allowed it to be registered as it's on its own in May of 2013. And then in response to one of your applications in September of 16, they say capsule, the term capsule merely describes the characteristic of an applicant's goods. Right. So somewhere along the line, they must have changed their minds about capsule. And sometimes that does happen as, you know, the PTO sees how the market is developing, the PTO's opinions may also develop. And that's the best guess that I can give you. What impact should that have on how this court looks at the question? At the time of Uncommon's registration, perhaps it wasn't – capsule was not descriptive of cases. But because there has been so much third-party use of capsule to describe cell phone cases, it certainly has become descriptive since then. And so the court should consider all this third-party use. It's not just Spigen that has been using capsule with its cell phone cases, but there's numerous other third parties who have been using it both descriptively to describe the case or as a mark. And there was at least one other application for capsule case for similar goods. And that – I believe that application was – refused part on descriptiveness. And trademark registration confers a presumption of validity. It's not an absolute, like, validity. It's rebuttable. And here the district court relied heavily on dictionary definitions in rebutting that presumption. Are those sufficient? Our case on the Seventh Circuit has said dictionary definitions alone shouldn't be relied on. Is that sufficient, what he did here, to overcome the presumption? Well, he didn't rely on – the court didn't rely on dictionary definitions alone. The court definitely focused on the definitions in the opinion, but he also considered that there was third-party use. And it was considered the PTO's opinions from Spigen's applications with their capsule marks where the disclaimers were required for being descriptive. And so the opinion clearly states that that entire record was considered before making this decision. But he – but the district court did focus on the dictionary definitions, and the dictionary definitions seem very, very clear. There's no mental leap required to go from capsule to case. The definition is a cover or a case for something, whether – I mean, regardless of what it's a case for. And it doesn't – and in order for a mark to be descriptive, the word doesn't have to specifically describe that particular good. It just needs to describe a characteristic of that good. And here, the word is capsule. Uncommon's good is a case. The definition and the goods align. Regarding secondary meaning, Uncommon did not present any evidence at summary judgment regarding secondary meaning. And this court has said a failure to respond to an argument results in waiver. And so by not responding to Spigen's arguments on secondary meaning at summary judgment, Uncommon effectively has waived its arguments here on appeal. I think it's waiver, or you think it's just a failure of proof? It could be both. I mean, they did – they – their heading kind of says it all. And I'll quote here. Their heading in the opposition said evidence of secondary meaning is unnecessary because the mark is not descriptive. I mean, they were banking on this presumption of validity, and they were banking on it not being found descriptive. And so they just didn't even bother to present evidence on secondary meaning. And that seems to be both a waiver, but then also they didn't have the evidence for secondary meaning. They didn't have evidence of exclusivity of use because there wasn't any. Spigen entered the market maybe half a year after Uncommon did, using capsule with its products. And there were numerous third parties throughout the years that also used capsule. It's hard for me to tell from the photographs that are in evidence. Are either of the products complete casings as opposed to just a back casing for the phone? So do either of the products go all the way around the phone? The cases go on the back, and they come over to the front just a little bit just to cover the lip of the front. Okay. Uncommon's case is two pieces where it fits together. But it doesn't – it's two pieces, but it doesn't cover the whole front? No, it doesn't cover the front. Okay. And Spigen's case is just one piece. And then another factor for secondary meaning is sales. And Uncommon's sales have reduced over time. They've declined presumably in part because they haven't produced a case for – a capsule case since iPhone 5. That was released in 2012. And we all know that Apple releases a new iPhone every year. So people aren't buying cell phone cases for older model iPhones when they're getting new phones every year. So their sales would naturally decline. And you can see this in their income statements, which, granted, give their entire income. But in the decline of their entire income, you can assume that part of that decline is due to the decline in their capsule sales. And those were in dockets 154 through 156. Their advertising is – they did do some, but it was ineffective by their own admission. They canceled using Google Ads because it was unsuccessful. They stopped using their marketing company because it was not successful. And all the celebrity mentions that they said they got, well, I mean, it doesn't – those photos and those mentions, they don't – they show a case, a celebrity holding a case, but they often didn't even say that it was an Uncommon case. It certainly didn't – never said that it was a capsule case. And Uncommon admits to that as well. So they're advertising when it's not – any promotional activities when it's not, like, actually connected to their mark is not evidence of secondary meaning. And even if – Ms. Kim, your time has expired. Oh, thank you. All right. Thank you. Mr. Campbell. Thank you. Just a few quick moments or comments here in my final seconds. Speaking acknowledges that they didn't recognize their own evidentiary – their own error and evidentiary gap until we pointed it out in their reply to their summary judgment. Yet apparently we were supposed to have identified that mistake and fixed it for them several months earlier. Secondly, the PTO disclaimers, it's important to note that those applications were being prosecuted during this case. In other words, it behooved – or it behooved Spigen to just accept those disclaimers, disclaim capsule, and then argue that, look, even the PTO says this mark is descriptive. I'm confident that if we'd been prosecuting those applications, we would have fought that disclaimer. Thank you. All right. Thank you. Our thanks to all counsel for cases taken under advisement.